RECORD NO. 15-4007

In The

# United States Court of Appeals

For The Fourth Circuit

UNITED STATES OF AMERICA,

*Plaintiff – Appellee*,

**v.**

PEDRO OSCAR DIEGUEZ, a/k/a The Cuban,

*Defendant – Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
AT CHARLOTTE

_____

BRIEF OF APPELLANT

_____

Peter C. Anderson
BEVERIDGE & DIAMOND, PC
409 East Boulevard
Charlotte, North Carolina  28203
(704) 372-7370

*Counsel for Appellant*

THE LEX GROUP ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA  23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

<u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ....................................................................iv

STATEMENT OF JURISDICTION...........................................................1

ISSUES PRESENTED FOR REVIEW .......................................................1

STATEMENT OF THE CASE...................................................................2

STATEMENT OF THE FACTS .................................................................4

     A)    Introduction ......................................................................4

     B)    Background on Mr. Pedro Oscar Deiguez ............................5

     C)    Background on Government's Investigation ........................6

          1)    Undercover tape recordings ........................................9

          2)    Reverse Buy/Bust.......................................................10

          3)    Search Warrants .........................................................11

          4)    Telephone records ......................................................12

          5)    Bank deposits ............................................................12

SUMMARY OF ARGUMENT ................................................................13

ARGUMENT .......................................................................................15

     I.    THE DISTRICT COURT ERRED BY IMPOSING A
          PROCEDURALLY UNREASONABLE SENTENCE .....................15

          A.    OVERVIEW AND GENERAL STANDARDS OF
               REVIEW ..............................................................15

B.    THE DISTRICT COURT ERRED IN FINDING THAT OVER 150 KILOGRAMS OF COCAINE WERE ATTRIBUTABLE TO DIEGUEZ................................................16

    i.    Standard of Review ........................................................16

    ii.    Discussion................................................................17

        a)    The Government's Witnesses Were Inconsistent and Unreliable .................................19

        b)    The Drug Quantities Were Not Sufficient Reliable or Corroborated ......................................24

        c)    The Government's Drug Estimates Don't Make Sense and Are Inconsistent with Cash Equivalent of Drug Proceeds...............................26

        d)    The District Court Provided No Independent Assessment ...........................................27

C.    THE DISTRICT COURT ERRED BY IMPOSING A LEADERSHIP ENHANCEMENT FOR MR DIEGUEZ' ALLEGED ROLE IN THE OFFENSE ...................................29

    i)    Standard of Review ........................................................29

    ii)    Discussion................................................................29

D.    THE DISTRICT COURT ERRED BY IMPOSING A GUN ENHANCEMENT ...........................................32

    i)    Standard of Review ........................................................32

    ii)    Discussion................................................................32

E.    THE DISTRICT COURT ERRED BY FAILING TO CONSIDER OR ADDRESS A CRITICAL SENTENCING FACTOR UNDER U.S.C. § 3553(a) .............37

i)  Standard of Review ........................................................ 37

ii)  Discussion .................................................................... 37

II.  ALTERNATIVELY, THE DISTRICT COURT ERRED BY IMPOSING A SUBSTANTIVELY UNREASONABLE SENTENCE ................................................................................ 40

i)  Standard of Review ........................................................ 40

ii)  Discussion .................................................................... 40

III.  THE EVIDENCE PRESENTED AT TRIAL PROVED MULTIPLE CONSPIRACIES RATHER THAN THE SINGLE CONSPIRACY CHARGED IN COUNT ONE, WHICH CONSTITUTED A CONSTRUCTIVE AMENDMENT OF THE INDICTMENT, AND WHICH VIOLATED MR. DIEGUEZ'S FIFTH AMENDMENT RIGHTS .................................. 42

i)  Standard of Review ........................................................ 42

ii)  Discussion .................................................................... 42

CONCLUSION .................................................................................... 47

STATEMENT REGARDING ORAL ARGUMENT ............................................. 48

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

## TABLE OF AUTHORITIES

Page(s)

<u>CASES</u>

*Apprendi v. New Jersey*,
    530 U.S. 466 (2000).........................................................................17

*Gall v. United States*,
    552 U.S. 38 (2007)...........................................................................41

*Rita v. United States*,
    551 U.S. 338 (2007).................................................................... 40-41

*United States v. Abu Ali*,
    528 F.3d 210 (4th Cir. 2008) ...........................................................40

*United States v. Apple*,
    962 F.2d 335 (4th Cir. 1992) ...........................................................33

*United States v. Banks*,
    10 F.3d 1044 (4th Cir. 1993) ...........................................................44

*United States v. Barsanti*,
    943 F.2d 428 (4th Cir. 1991) ...........................................................45

*United States v. Bowman*,
    926 F.2d 380 (4th Cir. 1991) ...........................................................23

*United States v. Cameron*,
    573 F.3d 179 (4th Cir. 2009) ...........................................................30

*United States v. Caplinger*,
    339 F.3d 226 (4th Cir. 2003) .....................................................15, 40

*United States v. Carter*,
    564 F.3d 325 (4th Cir. 2009) .............................................37, 38, 40

*United States v. Curry*,
    523 F.3d 436 (4th Cir. 2008) ..........................................................40

*United States v. Dove*,
    247 F.3d 152 (4th Cir. 2001) ..........................................................16

*United States v. General*,
    278 F.3d 389 (4th Cir.), *cert. denied*,
    516 U.S. 950 (2002) .......................................................................17

*United States v. Gilliam*,
    987 F.2d 1009 (4th Cir. 1993) ........................................................22

*United States v. Giunta*,
    925 F.2d 758 (4th Cir. 1991) ..........................................................44

*United States v. Hackley*,
    662 F.3d 671 (4th Cir. 2011) ..........................................................44

*United States v. Hampton*,
    441 F.3d 284 (4th Cir. 2006) ..........................................................40

*United States v. Harris*,
    39 F.3d 1262 (4th Cir. 1994) ..........................................................44

*United States v. Harris*,
    128 F.3d 850 (4th Cir. 1997) ....................................................16, 33

*United States v. Heater*,
    63 F.3d 311 (4th Cir. 1995) ............................................................44

*United States v. Hicks*,
    948 F.2d 877 (4th Cir. 1991) ..........................................................23

*United States v. Hines*,
    717 F.2d 1481 (4th Cir. 1983) ..................................................42, 45

*United States v. Jiminez Recio*,
    537 U.S. 270 (2003) .......................................................................43

*United States v. Kennedy*,
32 F.3d 876 (4th Cir. 1994) .........................................................................43

*United States v. Kiulin*,
360 F.3d 456 (4th Cir. 2004) ......................................................................16

*United States v. Lopez*,
219 F.3d 343 (4th Cir. 2000) ....................................................16, 22, 24, 28

*United States v. McAllister*,
272 F.3d 228 (4th Cir. 2001) ......................................................................33

*United States v. Mehta*,
594 F.3d 277 (4th Cir. 2010) ......................................................................23

*United States v. Montes-Pineda*,
445 F.3d 375 (4th Cir. 2006) ......................................................................41

*United States v. Ortiz*,
993 F.2d 204 (10th Cir. 1993) ...............................................................17, 25

*United States v. Paulino*,
996 F.2d 1541 (3d Cir. 1993), *cert. denied*,
510 U.S. 968 (1993).......................................................................................23

*United States v. Pupo*,
841 F.2d 1235 (4th Cir. 1988) .....................................................................43

*United States v. Randall*,
171 F.3d 195 (4th Cir. 1999) ................................................................16, 42

*United States v. Roberts*,
14 F.3d 502 (10th Cir. 1993) .................................................................17, 28

*United States v. Rusher*,
966 F.2d 868 (4th Cir. 1992) ........................................................................32

*United States v. Sarno*,
24 F.3d 616 (4th Cir. 1994) ........................................................................29

*United States v. Smith*,
    451 F.3d 209 (4th Cir.), *cert. denied*,
    549 U.S. 892 (2006).................................................................45

*United States v. Tingle*,
    183 F.3d 719 (7th Cir. 1999) ..............................................44

*United States v. Uwaeme*,
    975 F.2d 1016 (4th Cir. 1992) ...........................................23

*United States v. Watts*,
    519 U.S. 148 (1997)..........................................................23, 35

*United States v. Wilkinson*,
    590 F.3d 259 (4th Cir. 2010) ..............................................15

## STATUTES

18 U.S.C. § 924.......................................................................1, 2

18 U.S.C. § 1956(h) ...............................................................1, 2

18 U.S.C. § 3553.....................................................37, 39, 41, 48

18 U.S.C. § 3553(a) ..........................................................*passim*

21 U.S.C. § 841(b)(1)(A) .......................................................1, 2

21 U.S.C. § 846.......................................................................1, 2

28 U.S.C. § 1291..........................................................................1

## GUIDELINES

U.S.S.G. § 2D1.1.......................................................................33

U.S.S.G. § 2D1.1(b)(1) .......................................................32, 33

U.S.S.G. § 3B1.1.........................................................29, 31, 32

U.S.S.G. § 3B1.1(a) ...................................................................30

U.S.S.G. § 6A1.3...................................................................29

U.S.S.G. § 6A1.3(a) ...............................................................23

U.S.S.G. § 6A1.3(b)...............................................................22

OTHER AUTHORITY

Stephen S. Trott, *Words of Warning for Prosecutors
Using Criminals as Witnesses*, 47 Hastings L.J. 1381 (1996)...........................18, 19

## STATEMENT OF JURISDICTION

This appeal arises from the criminal prosecution of appellant Pedro Oscar Dieguez in the United States District Court for the Western District of North Carolina. The Bill of Indictment's three counts established the following bases for subject matter jurisdiction: 21 U.S.C. §§ 841(b)(1)(A), 846, Conspiracy to Distribute and Possess with Intent to Distribute Cocaine ("Count One") and 18 U.S.C. § 1956(h) Conspiracy to Commit Money Laundering ("Count Two") and Using and Carrying a Firearm During and in Relation to a Drug Trafficking Crime 18 U.S.C. § 924 ("Count Three"). J.A. 831.[1] On January 10, 2014, a jury found Mr. Dieguez guilty of Counts One and Two, and not guilty on Count Three. Final Judgment was entered on January 6, 2015, and Mr. Dieguez's trial counsel filed a Notice of Appeal from the District Court's final judgment on February 17, 2015. This appeal is from the District Court's final order, and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

(1)    WHETHER THE DISTRICT COURT ERRED BY IMPOSING A PROCEDURALLY UNREASONABLE SENTENCE BASED UPON INSUFFICIENT EVIDENCE RELATING TO DRUG AMOUNTS, OTHER ENHANCEMENTS, AND A FAILURE TO CONSIDER A CRITICAL SENTENCING FACTOR UNDER 18 U.S.C. § 3553(a)

(2)    WHETHER THE DISTRICT COURT ERRED BY IMPOSING A SUBSTANTIVELY UNREASONABLE SENTENCE

---

[1] "J.A." is a referenced to the Joint Appendix.

1

(3)     WHETHER THE DISTRICT COURT VIOLATED MR. DIEGUEZ' FIFTH AMENDMENT RIGHT BY ALLOWING THE GOVERNMENT TO PROVE MULTIPLE CONSPIRACIES RATHER THAN A SINGLE CONSPIRACY

<u>STATEMENT OF THE CASE</u>

Mr. Dieguez was one of three defendants charged in a Bill of Indictment filed on February 19, 2013, with three separate counts that spanned a period of nine years – from 2004 to 2013.  J.A. 11.  Count One charged him with Conspiracy to Distribute and to Possess with Intent to Distribute Cocaine 21 U.S.C. §§ 841(b)(1)(A), 846 (Five Kilograms or More).  Count Two alleged Conspiracy to Commit Money Laundering U.S.C. § 1956(h).  Count Three charged him with Using and Carrying a Firearm During and in Relation to a Drug Trafficking Crime 18 U.S.C. § 924.  J.A. 12.  While the other two alleged co-defendants pled guilty, Mr. Dieguez exercised his right to a jury trial.

On January 7, 2014, the trial against Mr. Dieguez trial began and was presided over by the Honorable Frank Whitney.  After a four day trial, the jury found him guilty of Counts One and Two, but acquitted him of Count Three.  J.A. 831 (PSR, ¶ 4).

On July 22, 2014, a draft Presentence Report ("PSR") was filed which included the following calculations arising from the convictions on Count One and Two:

- Base Offense Level Count One:      38      (From over 150 kg. of cocaine)

- Base Offense Level Count Two:      40      (Drug Base plus 2 points for money Laundering)

- Firearm Enhancement:      +2

- Leader/Organizer Enhancement:      +4

- Obstruction of Justice/Perjury:      +2

- Total Offense Level (Combined):      43

- Criminal History Points/Category:      0/I

J.A. 834-835 (PSR, ¶¶ 21-41).

On July 22, 2014, the Government filed objections to the PSR, which sought to highlight the evidence presented at trial against Mr. Dieguez, including references to historical drug transactions from as early as 2008 involving alleged drug amounts that the government believed should be attributable to Mr. Dieguez. J.A. 812. On July 30, 2014, Mr. Dieguez's counsel filed objections to the draft PSR, which generally challenged any and all factual statements and offense computations set forth in the PSR. It also specifically challenged the enhancements listed above. J.A. 824-825.

On October 20, 2014, Mr. Dieguez's trial counsel also filed a Motion for Variance, which set forth various grounds for a variance, pursuant to 18 U.S.C. § 3553(a). J.A. 693. Despite the fact that this Motion was only two pages long, it

did highlight a number of factors that fall within the scope of § 3553(a), including the nature and circumstances of the offense, as well as the background and character of the defendant.

On January 6, 2015, Mr. Dieguez appeared once again before the Whitney for sentencing. In addition, Mr. Dieguez' court-appointed counsel had come out of retirement to handle this sentencing hearing. J.A. 697. Despite the high stakes and massive sentence set forth in the PSR, the sentencing hearing was remarkably short (consisting of 38 transcribed pages), and included no testimony from witnesses to resolve the disputed issues.

After making some minimal findings, Judge Whitney sentenced Mr. Dieguez to 400 months imprisonment on Count One, and 240 months on Count Two (with the sentences to run concurrently), and five years of supervised release. J.A. 737. The final judgment and statement of reasons were filed on January 6, 2015. J.A. 737 & J.A. 847. On January 5, Mr. Dieguez filed a timely Notice of Appeal. J.A. 735.

## STATEMENT OF THE FACTS

A)    Introduction.

This appeal focusses on what levels of factual proof are sufficient, and what procedures are proper, to support a conviction and a 400-month prison sentence upon, a 50-year old, non-violent, first offender, based upon circumstantial

evidence.  Accordingly, to help properly frame the issues, it is important to focus on Mr. Dieguez, as well as an overview of this federal drug investigation.

      B)    <u>Background on Mr. Pedro Oscar Deiguez.</u>

Prior to being indicted in 2014, Mr. Dieguez embodied the American Dream.  After attending the Cuban Naval Academy and serving in the Cuban Navy, he left Cuba for political reasons in 1995, and came to the United States in search of a better life, with more opportunity and freedom.  He is a permanent resident, having resided in the United States for almost 20 years, and living in North Carolina since 1997.  J.A. 455.

Over the past twenty years, he worked hard in mastering a unique craft in the medical optics field and was gainfully employed since 1999, earning a decent income, and ultimately owning his own business (JED Endotek).  J.A. 838 (PSR ¶ 53). More specifically, even the Government conceded that during the relevant time period, Mr. Dieguez was making between $90,000 and $180,000 of legitimate income, as well as a payout of roughly $400,000 from the sale of his business. J.A. 157. On a personal level, he is happily married (since 1999), has two young children, and owns his own home in Union, N.C.  J.A. 450.  Even more importantly, Mr. Dieguez had absolutely no criminal history, or any prior involvement or arrests for drug-related activities.  J.A. 836 (PSR ¶¶ 40-41).

However this American Dream became a nightmare in 2012, when he was dragged into the crosshairs of a federal drug investigation that attempted to cobble together different players and disparate drug busts that spanned over nine years. The only apparent connection or similarities in these busts was the pattern of "fingering" Mr. Dieguez after the fact.

After being convicted at trial and sentenced to serve 400 months, this 50-year old man's life now He is a 50-year old man, hangs in the balance. While Judge Whitney kindly wished Mr. Dieguez "good luck" at the close of his sentencing hearing (J.A. 733), what Mr. Dieguez needs is for this Court to carefully examine the entire record in this circumstantial case, which warrants a new trial and/or sentencing hearing.

C)    Background on Government's Investigation.

The government first became aware of allegations that Mr. Dieguez was involved in cocaine conspiracy in June of 2008, based upon the allegations of **Mr. Jamie Sanchez**. J.A. 831; (PSR, ¶ 8); and J.A. 815 (Gov't PSR objections). Not surprisingly, these accusations were made after Mr. Sanchez was arrested in the presence of seventy (70) kilograms of cocaine. J.A. 45. Seven months later, in January, 2009, the DEA seized 37 kilograms of cocaine from a furniture store in Hickory, NC that was owned by **Isaac Galvez-Rios**. During a related search of a residence on the same day, the DEA also arrested two other drug dealers at the

time named **Wilfredo Ayala** (who had 1 kilogram of cocaine in his possession), and **Joel Diaz-Fernandez**. Not surprisingly, given that they were actually caught with large amounts of cocaine, these individuals came forward to "finger" Mr. Dieguez as being involved. J.A. 85 & 86. After his arrest, Joel Diaz-Fernandez claimed that Mr. Dieguez was involved with drug distribution for seven months – between June of 2008 and January of 2009. J.A. 832 (PSR ¶ 10). According to the Government, these accusations were corroborated by a 40-page house appraisal and income tax returns that Mr. Dieguez had faxed to Isaac Galvez-Rios' furniture store on January 9, 2009. J.A. 92 & 93 (Gov't Ex. 7 and 7a).

Despite the allegations from three confessed drug dealers that Mr. Dieguez was involved in a drug trafficking, the federal agents did nothing in 2009 to initiate any proactive investigation, despite having willing cooperators and presumably on-going drug activities. Such an investigation would have prevented the government from having to rely upon historical, speculative and biased allegations. It would also have resulted in direct and undisputed evidence of Mr. Dieguez' involvement, role, and attributable/foreseeable drug amounts.

Another cooperating witness was **Hugo Garcia-Cortez**, who had originally been arrested in May of 2008 with 10 kilograms of cocaine, and $419,000 in cash. J.A. 832 (PSR ¶ 9). At that time, he was debriefed but never mentioned anything about Mr. Dieguez. However, this changed dramatically (and suspiciously) after

he was arrested a second time in April of 2012 in the presence of 1 pound of methamphetamine.   J.A. 47.   At that point, he was aware of the pending investigation and accused Mr. Dieguez as being involved.

To bolster the prior allegations of the convicted drug felons, in 2012 the federal agents developed a confidential source to have meetings with and recorded conversations with another target named Juan Diego Aquilar-Preciado ("Diego"), who was the nephew of another target named Maximiliano ("Max") Aguilar-Rodriguez.   J.A. 125 & 126.   These two individuals were indicted with Mr. Dieguez as alleged co-conspirators.

According to Agent Billings, these recorded conversations in 2012 helped the investigators confirm that these individuals were involved in drug trafficking, and that they had a close relationship with Mr. Dieguez.  J.A. 126.  In fact, the case agent stated that they learned of a "drug nexus" between "Max" and Mr. Dieguez. J.A. 127.  Moreover, at that time, the case agent testified that their "ultimate goal was to investigate exactly what type of conspiracy was ongoing to determine who was involved and to see if there was actually a case there . . ." J.A. 129.

After initiating the active investigation in 2012 with a confidential informant ("CI"), the federal agents used slightly more reliable tools, which included two undercover tape recordings, document subpoenas for bank and telephone records, and a search warrant for Mr. Dieguez' office and residence.

1)      <u>Undercover tape recordings.</u>

During the course of the trial, the Government did introduce two different audio recordings that had been taped in the course of the investigation by a confidential cooperating witness.  One tape was made on April 11, 2012, and captured the conversation between the confidential informant and Max Aguilar-Rodriguez.  J.A. 127.  It is undisputed that Mr. Dieguez was not present, nor part of this conversation, and was away on a trip.  According to the case agent, the goal in these conversations was "to see if Mr. Pedro Oscar Dieguez was involved, in fact, involved in drug trafficking activities."  J.A. 129.  This statement confirms that up until this point in the investigation – despite having the allegations from three convicted drug felons who were caught with drugs and were alleging that Mr. Dieguez was involved – the agent was not confident that these accusations were truthful.

During this taped conversation on April 11, 2012, which Max had requested take place at Mr. Dieguez' ranch (despite him not being present), it appeared that the CS and Maximiliano Aguilar-Rodriguez used drug-related terms and discussed some preliminary plans for some future drug dealing.  J.A. 130 (Referencing Govt Ex: 11 & 11a).

The other audio recording that was made on June 29, 2012 was the only recording where Mr. Dieguez was involved in a lengthy conversation, some of

which admittedly sounded suspicious. The taped conversation involved three different people: the cooperating witness, Mr. Dieguez and "Max." J.A. 137 (Referencing Govt' Ex 12a & 12b). As previously noted, despite the suspicious comments made during part of this conversation, the recording fails to set forth any specific plans or details involving actual drug amounts. J.A. 48.

        2)   <u>Reverse Buy/Bust.</u>

Apparently, based upon these two audio recordings in mid-June, 2012, the Government was convinced that "Max" and his nephew "Diego," as well as Mr. Dieguez were "involved in the business of finding cocaine source of supply to buy from, or to get cocaine from, and then to distribute it elsewhere." J.A. 141. According to the case agent, based upon this assumption, the next step was for the Government to "fit their story" into a "reverse buy/bust" since they now knew what these targets were looking for. J.A. 141. For unexplained reasons, the Government never set up wiretaps to capture the *actual content* of any contemporary telephone calls at that time. J.A. 15-16. Equally puzzling was that nothing significant occurred in the investigation for a period of six months – between the recordings of mid-June of 2012 and the "reverse buy/bust" in January, 2013. J.A. 143 & 144.

The first step of this "reverse buy/bust" was to send the undercover source with a small amount of cocaine to give the targets a "surprise flash." J.A. 142.

Tellingly, this flash took place after a meeting between the cooperating witness and "Max" and "Diego" – the two individuals who had been captured on that first undercover tape recording. Once again, Mr. Dieguez was not present for this "flash." One week later, on January 15, 2013, the Government set up yet another undercover meeting between the cooperating witness and "Max" and "Diego" in which these individuals apparently discussed the details on how to obtain 10 kilograms of cocaine. J.A. 147. Two days later, on January 17, 2013, all of the co-defendants were arrested, and the government executed search warrants.

3)    <u>Search Warrants.</u>

Another tool used in this federal investigation was the execution of a search warrant at Mr. Dieguez' home and business – which took place on January 17, 2003. Assuming that the allegations from the cooperating drug felons were accurate; this search should have revealed strong corroborating evidence against Mr. Dieguez. Instead, however, these searches revealed no drugs whatsoever. J.A. 148. The search also failed to uncover large amounts of cash; or any drug ledgers or detailed records; or any other typical and reliable "clues" that you would expect to be found around someone who was allegedly a "huge drug kingpin" that had been moving "massive quantities" of cocaine for nearly a decade.

The only evidence the government introduced from these searches were two guns that were found in Mr. Dieguez' home: 1) a .22 caliber, antique revolver,

11

which was a "family heirloom" and which the case agent described as a "collector's" item. J.A. 172 a .45 caliber handgun which was found in a desk drawer in the dining room (with no direct evidence that Mr. Dieguez ever used or handled the gun). J.A. 712.

4)    Telephone records.

In addition to these recordings, and the search warrants, the Government also subpoenaed and introduced historical telephone records – but only for the period between April 1, 2008 and January 31, 2009. These records did show a pattern of calls between Mr. Dieguez's cell phone and the alleged co-defendants. J.A. 99 (Referencing Govt Ex. 8). Since it was undisputed that Mr. Dieguez knew these people and had legitimate, non-criminal reasons to communicate with them , the *number* of calls was a poor substitute compared to what could have been revealed by capturing the *content* of the calls. J.A. 153. In addition, in stark contrast with the pattern found within other drug conspiracies, Mr. Dieguez has retained the same cell phone for over a decade, which remained in his name with his accurate address.

5)    Bank deposits.

In an attempt to bolster the claim that Mr. Dieguez received and laundered illegal drug proceeds, the Government also gathered and introduced bank records from Branch Bank & Trust ("BB&T"). These records reflected various cash

deposits that Mr. Dieguez admittedly made into his account between 2008 and 2012, which totaled roughly $200,000. J.A. 163.

As previously noted, the evidence and testimony introduced at trial to prove that Mr. Dieguez was involved in drug dealing was purely circumstantial. The basis for the critical drug amounts that drastically enhanced his sentence was speculative at best, and was derived from highly questionable, unreliable and biased sources. In stark contrast, each of these cooperating drug felons had been actually caught in the physical presence of large quantities of drugs, and had plead guilty to sentences which carried substantial jail time. Accordingly, their credibility when trying to work off a lengthy drug sentence by providing "substantial assistance" was highly suspect.

## SUMMARY OF ARGUMENT

This case relates to a drug conspiracy that allegedly involved hundreds of kilograms of cocaine, and supposedly spanned nearly a decade. Yet, as reflected in the transcripts, the appellant – Mr. Pedro Oscar Dieguez – was never found in the presence of any cocaine, or the "reliable clues" that often accompany a large scale drug trafficking operation. Instead, this case rests upon circumstantial evidence – including accusations from convicted drug felons who were actually caught with large amounts of cocaine; an undercover audio recording of Mr. Dieguez with suspicious references; telephone records showing a pattern of calls; bank records of

cash deposits; and a faxed appraisal. Based upon how the evidence was allowed to be presented, the jury found enough evidence to convict on the drug and money laundering counts, but acquitted on the firearm charge. This appeal will determine whether our criminal justice system can properly evaluate the quality of such circumstantial evidence and maintain meaningful standards of proof – both as to liability, but also to drug quantities and various sentencing enhancements.

It is undisputed that Mr. Dieguez knew, and regularly interacted with, many of the men who testified against him, in the Charlotte, North Carolina for legitimate reasons. However, given the extreme pressures that exist when a person is caught with large amounts of cocaine, it is understandable why someone would accuse others and exaggerate their role and the amounts of drugs that were involved. This appeal seeks to highlight the limited and deficient quality of the evidence presented, and overturn the conviction and sentence based upon the speculative and vague accusations from cooperating convicted felons.

As noted through this brief, there were substantial errors committed at the trial, as well as during the sentencing hearing. These errors are both procedural and substantive, and arose from imposing a sentence that was unnecessarily excessive, and which was based upon speculative, vague, biased and unreliable allegations. In addition, the District Court failed to include a jury instruction that would have assisted the jury in evaluating the legal standards relating to single and

multiple conspiracies.  Accordingly, this appeal seeks to overturn the underlying conviction and/or vacate the sentence that was imposed.

ARGUMENT

## I. THE DISTRICT COURT ERRED BY IMPOSING A PROCEDURALLY UNREASONABLE SENTENCE.

### A. OVERVIEW AND GENERAL STANDARDS OF REVIEW.

On appeal of criminal sentences, this Circuit review legal questions, including the interpretation of the Guidelines, de novo, while factual findings are reviewed for clear error.  *United States v. Caplinger*, 339 F.3d 226, 233 (4th Cir. 2003).  The Courts' review takes place in two sequential steps.  First, the Court must ensure that the District Court did not comment procedural error in sentencing.  If it did, the Court must vacate and remand for resentencing.  *United States v. Wilkinson*, 590 F.3d 259, 269 (4th Cir. 2010).  If the Court concludes that no significant procedural error occurred, the Court then considers the substantive reasonableness of the sentence under an abuse of discretion standard.  For this case, Mr. Dieguez is raising both challenges, which will be discussed in sequence.

Before imposing a 400-month prison sentence upon a non-violent, first time offender, where no actual drugs were seized from the defendant and the evidence is derived largely from cooperating convicted drug felons, the District Court must pay particular attention to the proper procedures and give meaning to the standards.

In this case, the District Court's discretionary findings on multiple sentencing enhancements served to more than **triple** the prison sentence from the statutory minimum 120 months to 400 months. Accordingly, these alleged sentencing errors are just as critical as the threshold finding of guilt by the jury. As it currently stands, this case is yet another example where the "sentencing tail wags the liability dog." This Circuit reviews findings of fact relating to sentencing enhancements for clear error. *United States v. Harris*, 128 F.3d 850, 852 (4th Cir. 1997).

**B.**     **THE DISTRICT COURT ERRED IN FINDING THAT OVER 150 KILOGRAMS OF COCAINE WERE ATTRIBUTABLE TO DIEGUEZ.**

i.     Standard of Review.

On appeal, the calculation of the appropriate drug quantity attributable to a defendant is a factual finding made the is reviewed for clear error. *United States v. Kiulin*, 360 F.3d 456, 461 (4th Cir. 2004); *United States v. Randall*, 171 F.3d 195, 210 (4th Cir. 1999); *United States v. Lopez*, 219 F.3d 343 (4th Cir. 2000). So too, is the court's determination or what constitutes relevant conduct." *United States v. Dove*, 247 F.3d 152, 155 (4th Cir. 2001). Despite these highly deferential standards, Mr. Dieguez submits that they were not met, based upon the facts of this case.

ii.   Discussion.

While proof to support drug quantities that do not increase the statutory maximum is not implicated by *Apprendi v. New Jersey*, 530 U.S. 466 (2000), district courts are still required to assure that the evidence satisfies the threshold of "preponderance of the evidence." *United States v. General*, 278 F.3d 389, 393 (4th Cir.), *cert. denied*, 516 U.S. 950 (2002). This lower standard must still have meaning and is especially critical, where – as in this case – the jury's verdict specifically found that the amount of cocaine was "at least 5 kilograms," but where the defendant is sentenced for 30 times that amount – or 150 kilograms. J.A. 691.

Because the determination of drug quantity is so critical to calculating the sentence imposed, and the call here produced such an onerous sentence, similar to the 10th Circuit, this Court "cannot permit the district court to ground its conclusion in 'midair.' *See United States v. Roberts*, 14 F.3d 502, 519-22 (10th Cir. 1993). Also as stated by the 10th Circuit, the most relevant issue "is not whether the Defendant distributed [drugs], but rather the quantity of [drugs] that the Defendant distributed." *See United States v. Ortiz*, 993 F.2d 204, 208 (10th Cir. 1993).

In the majority of drug conspiracy cases, including all of the cases involving the cooperating government witnesses, the defendants are caught in the presence of large amounts of cocaine. In other cases, the "sufficient indicia of reliability" can be found in photographs or videotapes of the actual, contemporaneous drug

17

transactions; or undercover buys from the defendants; or wire-tapped telephone calls that capture the content and specific details of the actual drug transactions. Here, despite being aware of allegations and suspicions about Mr. Dieguez since 2008, which was 6 years before he was indicted, the government sought to impose a 400 month sentence based largely upon unreliable and speculative circumstantial evidence.

In drug conspiracy prosecutions, where the government is forced to rely upon other cooperating convicted drug felons, it is appropriate to heed the wisdom of the Honorable Stephen S. Trott, a former official within the U.S. Department of Justice and a current member of the United States Court of Appeals for the Ninth Circuit:

> Criminals are likely to say and do almost anything to get what they want, especially when what they want it to get out of trouble with the law. . . this willingness to do anything includes not only truthfully spilling the beans on friends and relatives, but also lying, committing perjury, manufacturing evidence, soliciting others to corroborate their lies with more lies, and double-crossing anyone with whom they come into contact, including – and especially – the prosecutor. . . . Criminals are remarkably manipulative and skillfully devious. Many are outright conscienceless sociopaths to whom "truth" is a wholly meaningless concept. To some, "conning" people are a way of life. Others are just basically unstable people. A "reliable informer" one day may turn into a consummate prevaricator the next.

> Stephen S. Trott, *Words of Warning for Prosecutors Using Criminals as Witnesses*, 47 Hastings L.J. 1381, 1383 (1996).

As noted by the passage above, it is undisputed that the majority of the cooperating drug felons had some personal connection, or knew Mr. Dieguez in some way. However, the key question for assessing legality and fairness of the 400 month sentence imposed is whether the evidence presented about the **quantities** of cocaine involved in the alleged **single** conspiracy is sufficiently reliable.

a)      <u>The Government's Witnesses Were Inconsistent and Unreliable.</u>

In addition to the general questionable bias of the cooperating co-defendants, the additional "lack of reliability" is reflected in the sampling of statements made by the alleged "co-defendants" during their respective testimony. A detailed review of their respective trial testimony (on both direct and cross examination) revealed evidence of substantial bias, significant unreliability, as well as major inconsistencies and discrepancies from the content of their initial debriefings with law enforcement J.A. 693-694. The most common feature with most of these witnesses is that they consistently failed to even mention Mr. Dieguez to law enforcement when they were first arrested, and their true memories were the strongest. *See* J.A. 306-308 (cross-examination of Hugo Garcia-Cortez); J.A. 360 (cross-examination of Jaime Rios-Sanchez); and J.A. 389 (cross-examination of Joel Diaz-Fernandez). Some additional examples of the reliability problems with these Government witnesses are noted in the excerpts below:

19

i)    <u>Mr. Juan Diego Aguilar-Preciado</u>

    o    When "Diego" was asked where he went after the meeting with undercover witness on January 8, 2013. In response he said, "I don't remember. To my house." Then, he flip-flopped and stated he went to Mr. Dieguez' office. J.A. 219.

    o    "Diego" also stated that the people who were going to help redistribute the cocaine were "a guy by the name of Nano and other one by the name of Victor." No other witness corroborated this. J.A. 222. In addition, confusingly, "Diego" later states that Nano and Victor were actually "customers" that "Max" brought to Mr. Dieguez.

    o    When the District Court asked "Diego" to clarify the drug amounts that Mr. Diego was allegedly receiving, the witness contradicted his earlier estimates of 10 to 20 kilograms and stated that "the truth is, at the times, I don't know. I just knew that he was getting drugs." J.A. 226.

ii)   <u>Mr. Max Aguilar-Rodriguez</u>

    o    When "Max" was asked to identify his co-defendant, Mr. Dieguez, he responded that he had "seen him in jail." When the prosecutor followed up and asked whether or not he knew him from outside of jail, Max stated "No." J.A. 260.

    o    While later acknowledging that he knew, Mr. Dieguez, he could not remember the date when he met him. At first, Max stated he met him in "84", then "94," and finally, after the prosecutor lead by suggesting "2004," Max apparently provided the right answer. In the midst of such unreliable testimony, the proper remedy would be to strike the witness from testifying. Instead, the Court permitted the Government to treat him as a hostile witness, which allowed the prosecutor to lead this witness and essentially testify himself. J.A. 264-294.

o   When asked about how much drugs were offloaded at Mr. Dieguez' ranch, Max stated "180 kilograms" or "80 kilograms." J.A. 268.

o   When asked on cross-examination how many times he and his nephew had actually worked in the drug business together, "Max" initially stated "I did it once." Then, he later added, "maybe two or three times." J.A. 300. Lastly, and confusingly, he agreed the number was "two or more times," – "if I did it." J.A. 301.

o   Also during cross-examination, "Max" was perhaps the most eloquent and insightful when he responded to the defense attorney's questions by noting: "I came here to tell the truth, to pay for my mistakes. I want to be okay with myself, with the law, and *with the government. That is my truth*." J.A. 307 (*emphasis added*).

iii)   <u>Mr. Hugo Garcia-Cortez</u>

o   During his testimony, this two-time convicted drug felon estimated the relevant drug quantities as 10 kilograms or maybe 4 kilograms of cocaine. J.A. 323.

o   He also claimed never to have met with agents after he decided to cooperate in his prior cases J.A. 335-336. He also later denied ever meeting with the prosecutor in this case to prepare for his testimony. J.A. 338-341. The prosecutor summarized his shock to the Court (during a bench conference) by using such fitting statements as: "I can't explain this;" "It's strange:" "We're confused;" and that he was "dumbfounded." Despite this undisputed lapse in truth-telling, the Court merely gave a *post hoc* stipulation, rather than striking the entirety of his testimony. J.A. 338-341.

21

iv)   <u>Mr. Jaime Rios-Sanchez</u>

o   Despite allegedly being involved and aware of Mr. Dieguez' drug involvement, when asked to predict the amount of cocaine that Mr. Dieguez had actually received, he stated – "from the drugs being delivered to them, I didn't know much. But I did know about the money." With no break down into the number of deals, Mr. Rios-Sanchez stated that Mr, Dieguez had to have received "more than a million dollars." J.A. 356.

v)   <u>Mr. Isaac Galvez-Rios</u>

o   When this witness was asked whether he ever saw cocaine, he noted that he saw it only once "when Mr. Diaz brought the drugs to my store." J.A. 378. Later, despite stated that he had never seen the money; he claimed that he delivered the money from Mr. Dieguez to Mr. Diaz.

o   When asked about Mr. Dieguez' alleged was ever paid off, like other witnesses, he flip-flopped – first stating "yes," but later claiming no when the prosecutor corrected him. J.A. 381-382.

In a case such as this, where a first-time, non-violent offender is sentenced to a massive, 400 month sentence, based primarily upon disputed drug amounts, "the district court must make an *independent* resolution of the factual issue at sentencing." *United States v. Lopez*, 219 F.3d at 348 (*emphasis* added); *United States v. Gilliam*, 987 F.2d 1009, 1013 (4th Cir. 1993); *see also* U.S.S.G. § 6A1.3(b). More specifically, those findings must be made as to the drug quantity attributable to each defendant. *Lopez*, 219 F.3d at 348.

Perhaps most importantly, in order for the evidence to be considered when determining the sentence, it must have "sufficient indicia of reliability to support

22

it's probably accuracy." *See* U.S.S.G. § 6A1.3(a), comment, citing to *United States v. Watts*, 519 U.S. 148, 157 (1997). *See also United States v. Mehta*, 594 F.3d 277, 282 (4th Cir. 2010). While some degree of estimation involving drug quantities is acceptable in the sentencing process, *see United States v. Uwaeme*, 975 F.2d 1016, 1021 (4th Cir. 1992); many Circuits have held that this "is not a license to calculate the drug quantities by guesswork." *United States v. Paulino*, 996 F.2d 1541, 1545 (3d Cir. 1993), *cert. denied*, 510 U.S. 968 (1993).

Moreover, this Circuit has also held that a defendant has a due process right at sentencing to not be sentenced on the basis of "misinformation of a constitutional magnitude." *United States v. Bowman*, 926 F.2d 380, 382 (4th Cir. 1991). At a minimum, the factual evidence relied upon by the sentencing court must be sufficiently reliable, which means that it must go "beyond mere allegation." *United States v. Hicks*, 948 F.2d 877, 883 (4th Cir. 1991).

Turning to the facts of this case, the PSR concluded – based upon the summary provided by the prosecutor – that Mr. Dieguez was responsible for "150 kilograms or more of cocaine," which produced a base offense level of 38. J.A. 833 (PSR ¶ 15). Mr. Dieguez objected to these drug amounts. J.A. 824. As previously noted, the defense filed timely objections to the drug quantities that were estimated within the PSR. J.A. 824.

b)    The Drug Quantities Were Not Sufficient Reliable or Corroborated.

As previously noted, unlike many other drug conspiracies, the investigation in this case did not involve actual seizures of any cocaine from Mr. Dieguez; or confessions by him; or video surveillance of actual drug transactions, or wiretapped conversations that captured the details of actual drug transactions. Instead, the basis for the drug quantities arose from the "mere allegations" from these witnesses that were rooted in either: 1) *post hoc* estimates from convicted drug dealers who were actually caught with large quantities of cocaine and later accused Mr. Dieguez of being involved; or 2) vague, speculative hints of quantities mentioned by Mr. Dieguez during a single recorded conversation – that did not relate to any actual transaction that ever took place.  In short, the evidence and estimates presented by the Government as to quantities of cocaine that were attributable to Mr. Dieguez lacked the rudimentary elements of reliability.

Similar to the facts in *Lopez*, the record in this case does not reliably support the drug amounts that the District Court relied upon to impose this onerous sentence upon Mr. Dieguez.  *See* 219 F.3d at 348-49.  Apart from accusing Mr. Dieguez, which was the central common theme, there was limited no corroboration between accusers on the specific details that are central to a credible and "sufficiently reliable" estimates.

24

Similar to the posture and relief in *Ortiz*, this Circuit must conduct a meaningful review the district court's consideration of the alleged drug quantities which would also reveal a critical lack of "sufficient corroboration" from the allegations provided by a confidential informant. 993 F.2d at 207-208.

While the trial transcripts are chock full of instances where the cooperating convicted drug felons provided conclusive *allegations* of the amounts of cocaine that were involved in their own drug busts. For example, in supporting their drug quantity estimates – which are 3 times the already excessive amount set forth in the PSR – rather than perform a principled analysis and framework of the alleged conspiracy, the Government merely adds up the quantities of all the historical seizures from 2008, 2009 and 2012 from the various convicted cooperators, as well as any other possible statement or "puffery," made by anyone, that references any drug quantity. J.A. 719-720; *see also* J.A. 824. Such a wholesale compilation of allegations is the antithesis of the methodology that this Circuit – and the Constitution – requires.

In addition to simply adding up these alleged drug amounts from disparate sources. The prosecutor conclusively "squeezed" them into the same conspiratorial mold, regardless of the standards that ordinarily apply to the parameters of a conspiracy. Lacking is the principled analysis of the scope of the conspiracy, or a discussion about the details and interplay of the co-conspirators.

25

Toward the end of the sentencing hearing, the prosecutor merely concludes that "this weight is based upon his (Mr. Dieguez') numerous years with multiple co-conspirators trafficking cocaine." J.A. 723. The "kitchen sink" approach to introducing all cocaine transactions from all alleged co-defendants confused the jury; was improper since they were not sufficient similar or overlapping; and was unreliable since many of the cooperators had failed to name Mr. Dieguez at the time of their initial debriefings from years earlier. For these reasons, Mr. Dieguez' conviction needs to be overturned, or his sentence vacated.

        c)    <u>The Government's Drug Estimates Don't Make Sense and Are Inconsistent with Cash Equivalent of Drug Proceeds.</u>

Assuming, for the sake of argument, that the collective estimates of the drug quantities involved in this massive, overarching conspiracy was accurate, Mr. Dieguez would have amassed millions and millions of dollars. To borrow a well-known phrase linked to the film "*Jerry McGuire*," if this were true, the Government would have easily been able to "show us (or the jury) the money." In addition, if he were truly a major kingpin, the alleged $300,000 drug debt would have been readily paid off.

Presumably, these alleged drug amounts would have been reflected in the added value of his home (which had been in his wife's family's name for generations); other extremely valuable property improvements; additional cars or

other high net worth possessions; or higher balances in his bank accounts. No such evidence was found during the search, or from the bank records, or through the testimony of these willing cooperators.

    d)    <u>The District Court Provided No Independent Assessment.</u>

Apart from the unreliability of the allegations, the District Court performed no "independent" assessment or evaluation of the evidence relating to the drug quantities. Instead, in response to the objections from defense counsel, the District Court overruled the objection and summarily declared, with regard to the drug amount, that "I believe there was ample evidence presented at trial that it was at least 150 kilograms of drugs in this case." J.A. 710. Perhaps to provide further assurance the Court, the Government later responded by noting that it thought "there was evidence to support that the amount of drugs involved in the conspiracy exceeded 450 kilograms. . ." J.A. 713. Interestingly, during the sentencing hearing, the District Court never formally adopted the findings set forth within the PSR.[2] However, later in the sentencing hearing, the Court does vaguely adopt the Government's drug estimates by concluding that:

> the evidence strongly shows that you were a high level-leader in a very large-scale multi-kilo conspiracy. The quantities of cocaine are enormous, quite honestly, in your case. As Mr. Kaufman (the prosecutor) was saying, hundreds of kilos. That's something this Court has rarely seen. The Court has

---

[2] The judgment does include a checked box which indicates the PSR was adopted. J.A. 737.

> seen hundreds and hundreds of drug trafficking cases, but very few where one individual is supervising a network that's distributing hundreds of kilos of cocaine. And I don't need to reach the exact number, but emphasize the nature and circumstances of the offense.

J.A. 725.

Just as in *Roberts*, 14 F.3d at 519-522, this Circuit needs to reverse this sentence imposed upon Mr. Dieguez for this lack of *independent* corroboration. Apart from its ruling, the 10th Circuit noted that "because the determination is so critical to calculating the sentence imposed and the call here produced such onerous sentences, we cannot permit the district court to ground its conclusions in midair." *Id*. at 521. In striking and remanding the sentence, the Circuit also concluded that the district court's findings "require more of a blueprint" to allow the Circuit to conduct its review).

Similar to *Lopez*, the alleged drug amounts were massive (e.g. over a hundred kg.), and much of the testimony was "conflicting and imprecise." *See* 219 F.3d at 348. While the testimony from the cooperators in this case did include numeric estimates of alleged drug amounts, these "mere allegations" had little corroboration and could have, just as easily, been the result of exaggeration of fiction. This is especially troubling since sources were biased convicted felons, and the circumstances that prompted their delayed and unreliable accusations were suspicious.

28

Accordingly, for all the foregoing reasons, the witnesses presented by the government are not the type of witnesses that can be relied upon to provide an upward adjustment under the Sentencing Guidelines.    Thus, the 6 level enhancement of Mr. Dieguez' sentence (from Level 32 to Level 38) based upon the drug quantity in excess of that amount found by the jury was clearly erroneous. Mr. Dieguez respectfully requests this Circuit to remand this case back to the District Court to give real meaning and vigor to the reliability standard within U.S.S.G. § 6A1.3.

**C.    THE DISTRICT COURT ERRED BY IMPOSING A LEADERSHIP ENHANCEMENT FOR MR DIEGUEZ' ALLEGED ROLE IN THE OFFENSE.**

i)    Standard of Review.

A district court's factual determinations on sentencing enhancements, including the role in the offense, are reviewed for clear error.  *United States v. Sarno*, 24 F.3d 616, 622-623 (4th Cir. 1994).

ii)    Discussion.

The Guidelines allow for a range of sentencing enhancements (from 2 – 4 levels) based upon a defendant's role in the offense.  *See* U.S.S.G. § 3B1.1.  To qualify for an adjustment under this section, the Guidelines state that the defendant "must have been the organizer, leader, manager, or supervisor or one of more other participants."  *See* Commentary, note 2.  In addition, the Guidelines also offer a list

29

of factors that a court should consider in making such critical enhancement decisions, including:

- the exercise of decision making authority
- the nature of participation in the commission of the offense
- the recruitment of accomplices
- the claimed right to a larger share of the fruits of the crime
- the degree of participation in planning or organizing the offense
- the nature and scope of the illegal activity; and;
- the degree of control and authority exercised over others.

*See* Commentary, note 4.[3]  *See United States v. Cameron*, 573 F.3d 179, 184 (4th Cir. 2009).

Turning to the facts of this case, as previously noted, Mr. Dieguez' trial counsel objected to the application of the 4-level enhancement within the PSR. J.A. 815.  In applying the enhancement, the PSR merely recited the language within U.S.S.G. § 3B1.1(a) J.A. 835. In responding to the defense counsel's objections the PSR addendum merely lists the five alleged coconspirators and concludes that:

> The defendant was an organizer or leader and numerous meetings were held at his business or at his ranch. At the meetings, plans were formulated for the delivery of drugs and the receipt of drug proceeds.  At one such meeting the defendant directed a confidential informant to take drop

---

[3] Interestingly, this commentary concludes by noting that this adjustment "does not apply to a defendant who merely suggests committing the offense."  Based upon the statements made by Mr. Dieguez made in the only taped recording where his voice appears, this exemption should preclude the enhancement.

> proceeds to the Dieguez business and place the money in Fed-
> Ex boxes.

J.A. 844 (PSR Response).

At the sentencing hearing, while preserving his client's denial of his involvement, the defense lawyer reiterates his prior objections to the leadership enhancement by noting that "he was not a leader of any kind," and no such enhancement should apply   J.A. 706.

At this point in the sentencing hearing, the District Court turned to the government and gave them an opportunity to specifically rebut this defense objection with specific factual support.  Surprisingly, the prosecutor avoids the issue and fails to offer any specifics.  J.A. 706.

The reasons why no one can articulate any specifics that support this enhancement during the sentencing hearing is because they were absent from the trial.  A careful review of the trial transcripts will confirm that no witnesses provided any credible details that would support Mr. Dieguez' leadership role.  Absent is the testimony about how Mr. Dieguez planned out these alleged historical drug transactions, or how he directed or recruited others, or how he split up the alleged ill-gotten gains, or how he provided instructions or directions.  There is simply no testimony that matches up with any of the examples of leadership set forth in the comments that accompany U.S.S.G. § 3B1.1.

31

Even more surprising, in the midst of the lack of specifics provided by the Government, is that the District Court also fails to articulate any facts that support the leadership enhancement, or any of the many factors that were previously set forth in the Commentary to § 3B1.1. Instead, Judge Whitney overruled the defense objections, and reached the following conclusions:

> [t]he Court did sit through the trial testimony. The Court believed that the defendant clearly was the key organizer and leader in this conspiracy because so many of the meetings and arrangements were made at his ranch or at his farm. There were many people involved in this network. At least – at least five, which is required under 3B1.1 . . .

J.A. 708. The District Court's failure to provide a more robust response to the defendant's objections, which should have included specific factual statements from the trial, was an abuse of discretion.

### D. THE DISTRICT COURT ERRED BY IMPOSING A GUN ENHANCEMENT.

#### i) Standard of Review.

Similar to other sentencing enhancements, the standard of review for the application set forth in U.S.S.G. § 2D1.1(b)(1) is clear error. *See United States v. Rusher*, 966 F.2d 868, 880 (4th Cir. 1992).

#### ii) Discussion.

The Guidelines allow for a two-level increase in a defendant's base offense level "if a dangerous weapon (including a firearm) was possessed." U.S.S.G.

§ 2D1.1(b)(1). Application Note 3 of the Commentary to § 2D1.1 states that "the enhancement for weapon possession reflected the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." In order to prove that a weapon was present, the government need show only that the weapon was possessed during the relevant illegal drug activity. *See United States v. Harris*, 128 F.3d at 852; *United States v. Apple*, 962 F.2d 335, 338 (4th Cir. 1992). However, this enhancement should be overturned when the government fails to present sufficient evidence from which it could be reasonably concluded that the defendant possessed a dangerous weapon during any illegal drug activity. *United States v. McAllister*, 272 F.3d 228, 234 (4th Cir. 2001).

In *McAllister*, this Circuit was presented with speculative, general and unsupported allegations about how a defendant was a "narcotics customer" and was seen "with handguns many times." *Id.* In finding that the district court clearly erred, this Circuit was troubled by the fact that the cooperating witness statements did not reveal whether the defendant actually had "a handgun during a narcotics transaction." Without any specific allegations or descriptions, the Court noted the "the district court could only speculate regarding whether [the cooperating witness] ever observed [the defendant] in possession of a handgun during a drug transaction." *Id.*

33

Turning to the facts of this case, it is undisputed that Mr. Dieguez did possess two different guns in his house, which were the only items seized during the search of Mr. Dieguez' home and office that were introduced during the trial. One gun was a .22 caliber family heirloom revolver, and the other was a .45 caliber semi-automatic handgun. J.A. 165. Equally important is that fact that these guns were found with no ammunition, no clips and no cartridges nearby. J.A. 710.

It is well-recognized that a defendant's mere possession of guns alone does not trigger any sentencing enhancement. For obvious reasons, there must be some factual nexus between the use or possession of the guns and the drug conspiracy. Considering that there was no direct evidence that Mr. Dieguez ever participated in any actual drug deals, it goes without saying that there was no evidence that he ever possessed a gun during such illegal transactions.

In an attempt to trigger the enhancement, during the sentencing hearing, the prosecutor claimed that the semi-automatic handgun was stolen. J.A. 703-704. This allegation peaked the judge's interest and concerns. J.A. 703. Later in the hearing, the prosecutor contradicted himself, by informing the Court that that gun had not been stolen. J.A. 710. Recognizing the need to provide at least some use, the prosecutor also reminded the Court that one of the cooperating witnesses had testified that he had seen Mr. Dieguez shooting the .22 revolver on his ranch. J.A. 712. Lastly, the prosecutor also went further by referencing an out-of-court

statement made by a witness who did not testify, that Mr. Dieguez had asked him to get a handgun.   J.A 705.   A review of the testimony of "Max" Aguilar-Rodriguez reveals that, while this incident relates the Mr. Dieguez noting that he was "looking for a weapon."   In trying to push the witness further, the prosecutor asked the following leading question:

> "And isn't it true that Mr. Dieguez told you that he had the firearms to protect himself because some of the cocaine trafficking was at his residence?"

To which "Max" responded:

> "He – he hmm, T[4] told me that he had asked for a weapon.  I imagine it was for protection or for his safety.  I do not know."

J.A. 270.

The weakness of the evidence relating to the possession of the gun charge is reflected by the jury's acquittal of the defendant on Count Three.  Mr. Dieguez understands that an acquittal in a criminal case does not necessarily preclude the government from seeking a sentencing enhancement that is governed by a lower standard of proof.  *See United States v. Watts*, 519 U.S. 148, 155-57 (1997). However, Mr. Dieguez contends that the facts presented in this case fail to clear the threshold of a "preponderance of the evidence."

---

[4] "T" was allegedly Mr. Dieguez' "right-hand man" in the drug business, who cooperated with the Government, but whom the Government never called to testify, but also never chose to indict.  *See also* J.A. 706-707.

Despite the "non-stolen" status of the gun, and the lack of any clear nexus between the guns and the drug activities, Judge Whitney still applied the enhancement. More specifically, he concluded that:

> The Court, as to the gun enhancement, believes that, at least the .45 caliber was not clearly – not clearly improbably connected to drug trafficking. The .45 caliber was found in the dining room desk drawer near the entrance of the house. That appears to the Court to circumstantially be a weapon used for security, not just for personal entertainment. If he's using it for security and he's a drug dealer, then he's using it either against other drug dealers or he would be intending to use it against law enforcement. But the Court does believe circumstantially that weapon appears to have a security purpose and that security purpose was connected to drug trafficking.

J.A. 711.[5] The District Court made this ruling despite noting that "there's no evidence that the defendant personally handled the .45 – well, there is no direct evidence of that." J.A. 712. While the Court's underlying logic for this finding may be sound, it is simply not supported or warranted by the facts of this case. If this Court endorses Judge Whitney's reasoning, then what is to prevent the gun enhancement from being applied in every case where a person convicted of a drug offense also possessed a gun? Unfortunately, the District Court conflated the 2-point gun enhancement with the lower standards that apply to the charge of "possession of a gun by a convicted felon." Since Mr. Dieguez had no prior

---

[5] After initially deciding it did not need to rule on the .22 caliber, "collector's item" rifle, the District Court later changed its mind and also found that this family heirloom "had some connection to drug trafficking." J.A. 711 & 712.

36

convictions whatsoever, simple possession of these guns was insufficient. Based upon the facts presented, there was a complete lack of specific information or "links" between the gun and the illegal drug activities, as well as the vague reports by cooperating witnesses. Accordingly, the District Court erred by applying this 2-level gun enhancement.

### E.    THE DISTRICT COURT ERRED BY FAILING TO CONSIDER OR ADDRESS A CRITICAL SENTENCING FACTOR UNDER U.S.C. § 3553(A).

i)    Standard of Review.

The standard of review for this issue is abuse of discretion. *United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009). In discharging that duty, this Court must ensure that the sentence imposed contained no procedural errors, including whether the district court failed to consider on the record those sentencing factors offered pursuant to 18 U.S.C. § 3553.

ii)    Discussion.

The defense filed a document entitled, Motion for Variance. J.A. 693. The sentencing memorandum raised several factors that the defense specifically requested the district court to consider before imposing the final sentence. More specifically, this defense motion lays out a variety of positive personal characteristics about Mr. Dieguez. J.A. 693-695. While the District Court did note some of these factors, it failed to give them the proper weight. The provisions of

18 U.S.C. § 3553(a) require that all courts impose a sentence that is "sufficient, but not greater than necessary," to meet the statutory objectives of sentencing.

As noted by this Circuit, while a sentencing court need not "robotically tick through § 3553(a)'s ever subsection . . . a talismanic recitation of the § 3553(a) factors without application to the defendant being sentenced does not demonstrate a reasoned decision making or provide an adequate basis for appellate review." *Carter*, 564 F.3d at 329.

In particular, the sentencing transcript confirms that, at no time during the hearing did the District Court address one of the most critical factors to be considered pursuant to 18 U.S.C. § 3553(a) – namely the need to avoid unwarranted disparities between the alleged co-defendants. As noted below, the punishments imposed upon the alleged co-defendants were dramatically and unjustly less than what was imposed upon Mr. Dieguez:

| Cooperating Felon | Drug Amount | Sentence Imposed |
|---|---|---|
| Max Aguilar-Rodriguez | 5-15 Kg. (J.A. 305) | 70 months (J.A. 830) |
| Juan Aguilar-Preciado | 5Kg. (J.A. 213) | 46 months (J.A. 830) |
| Jaime Rios Sanchez | 70 Kg. (J.A. 346-347) | 156 months (J.A. 801) |
| Isaac Galvez-Rios | 38 Kg. (J.A. 373) | 63 months (J.A. 385) |

| | | |
|---|---|---|
| Joel Diaz-Fernandez | 95 Kg. | 121 months (J.A. 395) |
| Hugo Garcia-Cortez | 10 Kg (2008) (J.A. 73-74) 458 grams of Meth. (2012) (J.A. 78-79). | 135 months |
| Unindicted Co-Conspirator Tyrone Hicks (aka "T") | >150Kg. (J.A. 706-707) | Immunity / Not Charged |
| <u>Appellant</u> Pedro Oscar Dieguez | <u>Drug Amount</u> > 150 Kg. | <u>Sentence Imposed</u> 400 months (J.A. 737) |

To the extent that these individuals were co-conspirators, the drug amounts that were reasonably foreseeable to each is widely disparate, along with the accompanying punishments imposed. What further accentuates these disparities is the fact that the cooperating witnesses were actually caught with substantial quantities of actual drugs in their possession – yet they received far less time. In light of the gross and unfair disparities between the 400 month punishment imposed upon Mr. Dieguez, and the relatively lighter drug quantities and prison sentences imposed upon his alleged co-conspirators, the District Court's failure to address or consider this single critical factor set forth in 18 U.S.C. § 3553 was an abuse of discretion.

## II.    ALTERNATIVELY,    THE    DISTRICT    COURT    ERRED    BY IMPOSING A SUBSTANTIVELY UNREASONABLE SENTENCE.

i)    <u>Standard of Review.</u>

As previously noted, this this Circuit review legal questions, including the interpretation of the Guidelines, *de novo*, while factual findings are reviewed for clear error. *United States v. Caplinger*, 339 F.3d 226, 233 (4th Cir. 2003); *United States v. Hampton*, 441 F.3d 284, 287 (4th Cir. 2006). In particular, in assessing a sentence for reasonableness, it applies an abuse of discretion standard. *United States v. Curry*, 523 F.3d 436, 439 (4th Cir. 2008).

ii)    <u>Discussion.</u>

As previously discussed, Mr. Dieguez respectfully submits that his 400 month sentence arose from a series or procedural deficiencies. If this Court finds the Mr. Dieguez' sentence was procedurally flawed and unreasonable, it cannot review the sentence for substantive reasonableness. *United States v. Carter*, 564 F.3d at 330. However, if this Court does not find his sentence was *procedurally* unreasonable, for all the reasons below, it should find it *substantively* unreasonable. Mr. Dieguez acknowledges that this Court has held that a sentence that falls within a correctly calculated guidelines range is presumptively reasonable. *United States v. Abu Ali*, 528 F.3d 210, 261 (4th Cir. 2008). However, "the presumption is not binding." *Rita v. United States*, 551 U.S.

338, 347 (2007).  A defendant can rebut the presumption "by demonstrating that the sentence is unreasonable when measured against the 3553(a) factors."  *United States v. Montes-Pineda*, 445 F.3d 375, 379 (4th Cir. 2006).  In reviewing the substantive reasonableness of a sentence, this Court takes into account the "totality of the circumstances."  *See Gall*, 552 U.S. 38, at 51 (2007).

Based upon the reasons previously noted and discussed, Mr. Dieguez' guideline range was not correctly calculated.  Nevertheless, if this Court disagrees, the various mitigating factors present in this case should have resulted in a significantly lower sentence based upon 18 U.S.C. § 3553.  More specifically, as noted in the PSR, as well as the Motion for Variance filed by this trial counsel, Mr. Dieguez was a non-violent first-time offender, who came to this country and had an impressive employment record as an optical equipment technician.  He also had strong family ties and a unique role in being the sole financial provider for his wife and two young children.  Also, the extreme and unjust disparity in punishments imposed upon Mr. Dieguez and his alleged co-conspirators, which was never even addressed or considered by the District Court, warranted a substantial downward variance.  Rather than casually noting a few mitigating factors, and only granting a slight variance from a "life sentence" to one of "400 months," the District Court should have given a more reasonable and substantial reduction.  The District Court in this case selected an onerous sentence that paid little or no heed to the totality of

circumstances present in Mr. Dieguez' case.  Because 400 months is far greater than necessary to comply with the purposes of sentencing, and because the District Court failed to truly and fully consider all of the pertinent § 3553(a) factors, the sentence imposed upon Mr. Dieguez was substantively unreasonable, and warrants this Court to vacate the sentence and remand to the District Court for resentencing.

## III.   THE EVIDENCE PRESENTED AT TRIAL PROVED MULTIPLE CONSPIRACIES RATHER THAN THE SINGLE CONSPIRACY CHARGED IN COUNT ONE, WHICH CONSTITUTED A CONSTRUCTIVE AMENDMENT OF THE INDICTMENT, AND WHICH VIOLATED MR. DIEGUEZ'S FIFTH AMENDMENT RIGHTS.

i)    Standard of Review.

The Government has the burden of proving the single conspiracy as charged in the indictment.  *United States v. Hines*, 717 F.2d 1481, 1489 (4th Cir. 1983). The standard of review for determining whether the Government met this burden is the same as that used to test the sufficiency of the evidence to convict.  *Hines*, 717 F.2d at 1489.

ii)    Discussion.

A constructive amendment, or fatal variance, occurs when the government, through its presentation of evidence and/or argument, broadens the bases for conviction beyond those charged in the indictment.  *United States v. Randall*, 171 F.3d at 195.

In a conspiracy prosecution, a defendant may establish the existence of a material variance by showing that the indictment alleged a single conspiracy but that the government's proof at trial established the existence or multiple, separate conspiracies. *United States v. Kennedy*, 32 F.3d 876, 883 (4th Cir. 1994). If there is a material variance between the charge in the indictment and the facts proven at trial, reversal of the appellant's convictions is required if the variance caused actual prejudice to the appellant. *See Kennedy*, 32 F.3d at 883.

It is well recognized that "conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act." A conspiracy to commit the distribution offense must involve an agreement separate from the immediate distribution conduct that is the object of the conspiracy. *See United States v. Jiminez Recio*, 537 U.S. 270, 274 (2003).

As this Court is aware, there are meaningful limitations to a scope of a conspiracy, as well as the connections necessary to link a particular defendant to the conspiracy. For example, this Circuit has previously stated:

- The "mere knowledge, acquiescence, or approval of a crime is not enough to establish that an individual is part of a conspiracy." *United States v. Pupo*, 841 F.2d 1235, 1238 (4th Cir. 1988).

- The "mere presence at the scene of an alleged transaction or event, mere association with persons conducting the alleged activity, or mere similarity of conduct among various persons and that fact that they may has associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily

establish proof of the existence of a conspiracy." *United States v. Heater*, 63 F.3d 311 (4th Cir. 1995).

- A simple agreement to buy drugs is insufficient to establish a conspiracy between the seller and the buyer. *See United States v. Hackley*, 662 F.3d 671, 679 (4th Cir. 2011).

- A series of buyer-seller transactions will not support a conviction of a single conspiracy to distribute drugs. *United States v. Giunta*, 925 F.2d 758 (4th Cir. 1991); *see also United States v. Tingle*, 183 F.3d 719 (7th Cir. 1999); *United States v. Banks*, 10 F.3d 1044, 1051-1054 (4th Cir. 1993).

Turning to the facts of this case, based upon the open statement, trial testimony, closing arguments and PSR objections, the Government appeared to ignore these limitations and built their conspiracy based upon a flawed assumption that all of the cocaine that was ever dealt by all of the cooperating witness was automatically part of one large single conspiracy. This includes the amounts that were involved in seizures from 2008, 2009 and 2012 from various individuals, who had no prior connections. The conspiracy also allegedly stretched to encompass all of the historical drug dealing that was vaguely referenced through hearsay statements, or vague prospective future drug dealing that was captured on undercover tapes. While the law does recognize the scope of conspiracies can be broad, as previously noted, there are limits which were exceeded in this case.

Whether the Government has proven a single or multiple conspiracies is a question of fact for the jury. *United States v. Harris*, 39 F.3d 1262, 1267 (4th Cir. 1994). While a single conspiracy can be found in a case involving multiple

44

transactions, there must be a sufficient overlap of key actors, methods and goals, indicating one overall agreement or one general business venture. *United States v. Smith*, 451 F.3d 209, 218 (4th Cir.), *cert. denied*, 549 U.S. 892 (2006). In this case, given the variety of players, as well as the alleged variety of sources of supply, and the broad timeframe of a nine year span, that overlap is missing. At a minimum, the evidence of a single conspiracy was ambiguous.

However, despite the defense counsel's failure to object or submit an appropriate jury instruction on "single vs. multiple" conspiracies, the District Court erred in failing to provide one. *United States v. Barsanti*, 943 F.2d 428, 439 (4th Cir. 1991). *See United States v. Hines*, 717 F.2d 1481, 1489 (4th Cir. 1983). If the evidence shows that there was more than one conspiracy, we must reverse the verdict only where proof of the multiple conspiracies prejudiced substantial rights of appellants. *Id.* at 1489-90. A defendant's rights would be infringed if the jury would have been confused into imputing guilt to members of one conspiracy because of the illegal activities of the other conspiracy. *See id.* at 1490. In this case, this relief is warranted because the collective evidence and proof of multiple conspiracies was likely to have confused the jury into imputing guilt to Mr. Dieguez as a member of one conspiracy because of the illegal activity of members of the other conspiracy.

Ironically, during the testimony from the first government witness, Mr. Juan Diego Aguilar-Preciado ("Diego"), the witness provided clear evidence that contradicted the notion of a single, large conspiracy. More specifically, when describing some conversations between Mr. Dieguez and "Max," the witness indicated that Mr. Dieguez had allegedly stated that "He wanted to work on his own because they (some other drug dealers) had not paid him. So he invited us to work with him. But it was only us, he didn't want any more people working with us." J.A. 218.

Another error relating to the conspiracy evidence occurred when the District Court repeatedly erred, over the defense counsel's objection, to the prosecutor's direct examination questions that included the central legal conclusion as to whether Mr. Dieguez was involved in a conspiracy. For example, when questioning "Diego," apart from eliciting that he had plead guilty to a drug conspiracy, the prosecutor went beyond that by asking whether the witness saw "anybody in the courtroom today who is part of your conspiracy." J.A. 213. Despite some curative instructions, the damage and confusion had already been done by allowing a witness to reach a legal conclusion.[6]

---

[6] This pattern continued during the prosecutor's questioning of: 1) co-defendant "Max," who was improperly and repeatedly asked to reach legal conclusions about who else was "involved in the conspiracy." J.A. 257-259.

46

In short, the Government was permitted to take a "kitchen sink" approach by presenting disparate and isolated drug transactions and attempt to cobble them together into one single overarching conspiracy. Unfortunately, despite the failure of the defense counsel to object or to submit proper jury instructions, the District Court failed to include the "multiple vs. single conspiracy" jury instruction that would have given them the proper legal lens to evaluate the evidence.

When everything was permitted to be admitted, without a proper and limiting jury instruction, this collective fusion of the "spillover" evidence from separate conspiracies created the likelihood that the jury would unfairly transfer the guilt of the members of the separate conspiracies to Mr. Dieguez. Apart from the unfairly prejudicial impact upon the conviction, this approach was also used to inflate the drug quantities (as previously discussed).

For all of these reasons, the Government's evidence at trial resulted in a fatal variance between Count One and the evidence presented at trial. Accordingly, the Court erred in denying Mr. Dieguez's motion for judgment of acquittal as to Count One. Mr. Dieguez respectfully requests that his conviction for Count One be reversed and remanded for a new trial.

## CONCLUSION

For all the reasons set forth above, defendant-appellant Pedro Oscar Dieguez respectfully requests that this Court overturn his conviction, or in the alternative,

vacate his sentence and remand for resentencing with instructions to properly review the sentencing factors set forth 18 U.S.C. § 3553, and to properly hold an evidentiary hearing to scrutinize the evidence supporting such substantial drug quantities that were reasonably foreseeable to him, and the other alleged enhancements sought by the Government.

<u>STATEMENT REGARDING ORAL ARGUMENT</u>

Mr. Dieguez desires oral argument, which may be helpful in clarifying the facts and the parties' position with the respect to the important issues that this case presents.

Respectfully submitted this 10th day of July, 2015.

<u>/s/ Peter C. Anderson</u>
Peter C. Anderson
North Carolina Bar No. 18661
BEVERIDGE & DIAMOND, PC
409 East Blvd.
Charlotte, NC 28203
(704) 372-7370
(704) 372-7411 (fax)
panderson@bdlaw.com

Counsel for Appellant Pedro Oscar Dieguez

<u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P.
      28.1(e)(2) or 32(a)(7)(B) because:

      [ X ] this brief contains [*10,971*] words, excluding the parts of the brief
      exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

      [     ] this brief uses a monospaced typeface and contains [*state the number
      of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P.
      32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P.
      32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

      [ X ] this brief has been prepared in a proportionally spaced typeface using
      [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

      [     ] this brief has been prepared in a monospaced typeface using [*state
      name and version of word processing program*] with [*state number of
      characters per inch and name of type style*].


Dated: <u>July 10, 2015</u>              <u>/s/ Peter C. Anderson</u>
                                         *Counsel for Appellant*

<u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 10th day of July, 2015, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Amy E. Ray
> OFFICE OF THE U.S. ATTORNEY
> 100 Otis Street, Room 233
> Asheville, North Carolina  28801
> (828) 271-4661
>
> *Counsel for Appellee*

I further certify that on this 10th day of July, 2015, I caused the required copies of the Brief of Appellant and Joint Appendix to be hand filed with the Clerk of the Court and a copy of the Sealed Volume of the Joint Appendix to be served, via UPS Ground Transportation, upon counsel for the Appellee, at the above address.

> /s/ Peter C. Anderson
> *Counsel for Appellant*